Justice MIMS, dissenting.
 

 I disagree with the majority's conclusion that no assignment of error challenges the circuit court's ruling that the no-contest clause
 applied only to the changes made in the September 2012 amendment. To the contrary, I believe the trustee presents that challenge in her third assignment of error. I also disagree with the majority's conclusion that the evidence supports the circuit court's
 judgment that the trustee's decision to disqualify Paul and Basil Georgiadis ("the sons") for violating the no-contest clause was improper. Accordingly, I disagree with the majority's decision to affirm the circuit court's awarding attorney's fees to the sons. I therefore respectfully dissent.
 

 Initially, I must address the sons' assignment of cross-error in which they assert that the September 2012 amendment violates Code §§ 64.2-703(B) and 64.2-777(B). This is a threshold issue because it broadens the scope of the circuit court's review of the trustee's decision. Article VII(L) of the trust agreement as amended by the September amendment provides that "[a]bsent proof of fraud, dishonesty, or bad faith on the part of my Trustee, the decision of my Trustee that a beneficiary or potential beneficiary is not qualified to take a share of the trust assets [under the no-contest clause] shall be final." The parties agree that the plain language of this provision bars any challenge to a decision by the trustee to apply the clause to disqualify a beneficiary unless the challenge is based on one of the three specified grounds. However, the sons argue that this restriction is too narrow and is not permitted by the statutes. I agree.
 

 We review questions of statutory interpretation de novo.
 
 Roop v. Whitt,
 

 289 Va. 274
 
 , 278,
 
 768 S.E.2d 692
 
 , 694-95 (2015). The grantor of a trust in Virginia may not exempt a trustee from the fiduciary duties imposed by statute. Code § 64.2-777(B) expressly states that a trustee's exercise of power under a trust is subject to the statutory fiduciary duties. Those duties include administering the trust and investing its assets in good faith, Code § 64.2-763, so administration of the trust in bad faith is necessarily a breach of fiduciary duty. However, the statutory fiduciary duties are broader than mere bad faith or the two other grounds set forth in the trust agreement for challenging the trustee's decision to disqualify a beneficiary.
 

 As an illustrative, non-exclusive example of these statutory fiduciary duties, Code § 64.2-765 imposes a duty of impartiality. Partiality cannot be simply a form of bad faith because that would
 make Code § 64.2-765 duplicative of Code § 64.2-763. Such an interpretation violates our canons of construction.
 
 Owens v. DRS Auto. FantomWorks, Inc.,
 

 288 Va. 489
 
 , 497,
 
 764 S.E.2d 256
 
 , 260 (2014) ("We adhere to rules of statutory construction that discourage any interpretation of a statute that would render any part of it useless, redundant or absurd.") The same reasoning applies to the other statutory fiduciary duties. Yet the trust agreement does not appear to permit a beneficiary to challenge a trustee's decision that he or she is disqualified on the ground that such a decision was not impartial, or breached any other statutory fiduciary duty. To the extent that the trust agreement purports to restrict a beneficiary's ability to do so, the agreement is superseded by law. Code § 64.2-703(B)(11). Accordingly, the trust agreement may not limit the sons' ability to challenge the trustee's decision solely on the bases of fraud, dishonesty, or bad faith.
 

 Turning to the trustee's assignments of error with this standard in mind, I note that she first asserts that the circuit court erred by overruling her demurrer to the sons' complaint because they did not allege any of the three grounds set forth in the trust agreement as the basis for challenging her decision to disqualify them. When reviewing a circuit court's ruling on a demurrer, "we consider as true all the material facts alleged in the complaint, all facts impliedly alleged, and all reasonable inferences that may be drawn from such facts."
 
 Assurance Data, Inc. v. Malyevac,
 

 286 Va. 137
 
 , 143,
 
 747 S.E.2d 804
 
 , 807 (2013) (internal quotation marks and alteration omitted).
 

 The sons' complaint recites the statutory "fiduciary duties of good faith and fair dealing, loyalty, impartiality, [and] prudent administration" and asserts that the trustee's interpretation of the no-contest clause was "contrary to law, and in violation of the public policy of the Commonwealth of Virginia." These allegations imply that the trustee's decision was a breach of fiduciary duty, which is a question of fact.
 
 Williams v. Dominion Tech. Partners, L.L.C.,
 

 265 Va. 280
 
 , 290,
 
 576 S.E.2d 752
 
 , 758 (2003). Thus, in light of the statutory limitations on trust provisions imposed by Code § 64.2-703(B)(11) and 64.2-777(B), the complaint
 was sufficient and the circuit court did not err by overruling the trustee's demurrer.
 
 Perry v. Commonwealth,
 

 280 Va. 572
 
 , 580,
 
 701 S.E.2d 431
 
 , 436 (2010) ("When the trial court has reached the correct
 result for the wrong reason, but the record supports the right reason, we will assign the correct reason and affirm that result." (internal quotation marks omitted)).
 

 Nevertheless, as the trustee asserts in her second assignment of error, the sons failed to prove a breach of fiduciary duty at trial. A circuit court's factual findings "will be reversed on appeal only if such findings are plainly wrong or without evidence to support them."
 
 Specialty Hosps. of Wash., LLC v. Rappahannock Goodwill Indus.,
 

 283 Va. 348
 
 , 354,
 
 722 S.E.2d 557
 
 , 559 (2012). The sons, as the prevailing parties below, are "entitled to have the evidence and all inferences reasonably drawn from it viewed in the light most favorable to" them.
 
 RGR, LLC v. Settle,
 

 288 Va. 260
 
 , 283,
 
 764 S.E.2d 8
 
 , 21 (2014).
 

 The circuit court accepted the trustee's argument that the trust agreement required any challenge to her decision to be based only on fraud, dishonesty, or bad faith, and concluded that she had acted in bad faith. As noted above, administering a trust in bad faith is a breach of fiduciary duty. Code § 64.2-763. But the record includes no evidence supporting such a finding, or that the trustee breached any other statutory fiduciary duty. The evidence indicated that the trustee had been a friend of the sons' father (the grantor) and step-mother and included letters and emails in which the sons disparaged their father, their step-mother, and the trustee. The trustee testified that these communications-or so many of them as the sons' father received while he lived-upset him.
 

 However, these facts do not establish any breach of fiduciary duty by the trustee, nor do they support a reasonable inference of such a breach. To the contrary, the trustee testified that she sent the sons copies of the trust documents as quickly after their father's death as she could gather the documents, identify who was entitled to them, and make and send copies. She sent them on January 3, 2013, sooner than required by law. Code § 64.2-775(B). Coincidentally, that day, scarcely a month after his father's death, was the same day Paul mounted his assault on the trust by informing their father's attorney that it would be contested. The next day, Paul wrote his step-mother that the trust would be challenged if she did not agree to divide its assets equally between her and the sons.
 

 As soon as the trustee learned of Paul's letters, she met with counsel. She did not discuss the letters with the step-mother or ask
 her opinion of whether the letters violated the no-contest clause. The trustee testified that her decision to disqualify the sons was based solely on Paul's letters and the legal advice of counsel. She expressly denied that her decision was tainted by her knowledge that the sons' communications had upset their father before he died. She testified that the decision was a difficult one for her because of its "far reaching implications." Nevertheless, she believed it was not her place as trustee to determine whether the outcome was fair, but whether the trust agreement compelled it. Neither the trustee nor the step-mother benefited from the trustee's decision. While the trustee's counsel referred to the sons as "horrible" in closing argument, there is no indication that was the trustee's personal view of them, or even if it was, that she had formed that view before reaching her decision.
 

 In considering whether the sons violated the no-contest clause, the trustee was required by law to make a neutral assessment of whether Paul's letters and the sons' actions constituted a "direct[ ] or indirect[ ]" "challenge or contest" to the trust agreement, "by legal proceedings or otherwise." She bore a statutory burden of impartiality with regard to the sons and the contingent beneficiaries (who would share in the trust assets in their place if the sons violated the clause). Code § 64.2-765 ;
 
 see also
 

 Sturgis v. Stinson,
 

 241 Va. 531
 
 , 534-35,
 
 404 S.E.2d 56
 
 , 58 (1991) ("Under general trust law principles, where, as here, a trust is created for successive beneficiaries, the trustee has a duty to deal impartially with them."). The record reflects that she discharged this burden responsibly after deliberation and consultation
 with counsel, and dutifully compared what the sons did to what the clause forbade. There is simply no evidence that she bore antipathy toward the sons or that it clouded her judgment. Likewise, no trace of bad faith, partiality, or any other breach of her statutory fiduciary duties in the record.
 

 In her third assignment of error, the trustee asserts that the circuit court erred by interpreting the no-contest clause to prohibit challenges only to the September 21, 2012 amendment rather than the trust agreement as amended and restated on August 27, 2012 as a whole.
 
 *
 
 I agree.
 

 We interpret the provisions of a trust agreement de novo.
 
 Riverside Healthcare Ass'n v. Forbes,
 

 281 Va. 522
 
 , 528,
 
 709 S.E.2d 156
 
 , 159 (2011) ;
 
 see also
 

 Schuiling v. Harris,
 

 286 Va. 187
 
 , 192,
 
 747 S.E.2d 833
 
 , 836 (2013) (noting that we have an equal opportunity to consider the words of [an agreement] within the four corners of the instrument itself (internal quotation marks omitted)). The circuit court ruled that the words "this trust agreement" as used in the September amendment applied only to that amendment itself rather than to the entire trust agreement as amended and restated on August 27, 2012. However, the September amendment is not a trust agreement. Standing alone, it contains none of the elements required to create a trust.
 
 Massanetta Springs Summer Bible Conference Encampment v. Keezell,
 

 161 Va. 532
 
 , 541,
 
 171 S.E. 511
 
 , 514 (1933) (noting that an enforceable trust agreement "must be certain and definite in respect to the objects or persons who are to take, and also in respect to the subject matter thereof" (emphasis omitted)). Consequently, the words "this trust agreement" as used in the September amendment must refer not to that amendment alone but to that amendment together and collectively with the August 27, 2012 trust agreement it amends.
 

 In her fourth assignment of error, the trustee asserts that the circuit court erred by awarding the sons' attorney's fees. I agree.
 

 Code § 64.2-795 permits a court to award attorney's fees, costs, and expenses "as justice and equity may require." "We review the circuit court's decision to award attorney's fees for an abuse of discretion."
 
 Piney Meeting House Invs., Inc. v. Hart,
 

 284 Va. 187
 
 , 196,
 
 726 S.E.2d 319
 
 , 324 (2012). A court abuses its discretion when it commits a clear error of judgment.
 
 Shebelskie v. Brown,
 

 287 Va. 18
 
 , 26,
 
 752 S.E.2d 877
 
 , 882 (2014).
 

 The circuit court's award of attorney's fees in this case was predicated on its conclusion that the trustee's decision to disqualify the sons based on the no-contest clause was improper. Because that conclusion was incorrect, the court committed a clear error of judgment in awarding the sons' attorney's fees.
 

 Finally, in their first assignment of cross-error, the sons assert that the circuit court erred by finding that their conduct was sufficient to violate the no-contest clause, because only a legal action constitutes a challenge to the trust agreement. I disagree.
 

 As the sons acknowledge, we have upheld no-contest clauses to "effectuate the [grantor's] legitimate interest in preventing attempts to thwart his intent."
 
 Virginia Found. of Indep. Colleges v. Goodrich,
 

 246 Va. 435
 
 , 438,
 
 436 S.E.2d 418
 
 , 420 (1993). They likewise acknowledge that we enforce no-contest clauses "according to their clear terms."
 
 Keener v. Keener,
 

 278 Va. 435
 
 , 443,
 
 682 S.E.2d 545
 
 , 548-49 (2009).
 

 The no-contest provision in this case clearly prohibits a beneficiary from "directly or indirectly" "challeng[ing] or contest[ing]" the trust agreement, "by legal proceedings
 
 or otherwise.
 
 " (Emphasis added). The sons'
 

 argument would render the words "or otherwise" meaningless, contravening the clear terms of the no-contest clause.
 

 Further, Paul's January 3 letter to his father's attorney stated that the trust "
 
 will be
 
 the subject of a contest." (Emphasis added.) Similarly, his January 4 letter to his step-mother threatened that if she did not accept the sons' proposal to disregard the trust and divide its assets equally between them, they "would be moving to have the [c]ourt recognize [their father's] long-established will and trust in place for over 23 years as against the current will and trust in place only in the last three months of his life." No clearer evidence of their intent to thwart their father's wishes as expressed in the trust agreement is required.
 

 Accordingly, I would reverse the judgment of the circuit court and remand for further proceedings to determine whether the trustee or the trust should be awarded attorney's fees, costs, and expenses under Code § 64.2-795.
 

 Justice KELSEY, with whom Justice McCLANAHAN joins, dissenting.
 

 The majority treats this case as a routine abuse-of-discretion review of a trustee's actions and, even in that context, affords rather nominal deference to the trustee. But that is not the proper paradigm. The settlor specifically intended his trustee's determination-in
 the limited context of the no-contest provision-to be "final" in the absence of a showing of "fraud, dishonesty, or bad faith on the part of [the] Trustee." J.A. at 299. No such showing has been made in this case. The underlying question in this case is not whether the no-contest provision was violated. It is who gets to make that call. Absent egregious circumstances, the settlor of this trust intended his trustee-not the litigation machinery of the court system-to umpire this dispute. I believe settled principles of trust law affirm, not disaffirm, the settlor's clearly articulated intent.
 

 I.
 

 In 1989, Dimitri Georgiadis established a revocable trust for his wife, making her an income beneficiary and naming his two sons from a prior marriage, Paul and Basil, as remainder beneficiaries. The trust agreement initially appointed the two sons as co-trustees.
 

 On August 27, 2012, the father "amend[ed] and restate[d] the Trust Agreement in its entirety."
 
 Id.
 
 at 278. The restatement removed the two sons as co-trustees, named the father "to serve alone as [his] Trustee" during his lifetime,
 
 id.,
 
 and designated his financial advisor, Celia Rafalko, as the successor trustee, effective upon his "resignation, incapacity or death,"
 
 id.
 
 at 289. The restatement also made a larger portion of the trust corpus available to his wife in time of need, while leaving the remainder of the trust to the sons upon her death.
 
 See
 

 id.
 
 at 279-82. One of the two sons, Paul, who is an attorney, was present at the execution of the restatement.
 

 After the August 2012 restatement, the sons began a campaign to undo the changes to the trust. They wrote letters and emails and left messages on their father's voicemail. Basil wrote his father complaining that their stepmother, the income beneficiary of the trust, "will have won the lottery" when he dies.
 
 Id.
 
 at 316. The closing lines of a letter from Paul to his father reads: "So much for loyalty to your own blood and fair play from Step-Mum. Dad, I have NOTHING more to say about this and won't debate it with your [sic] or discuss it with [your wife]. Your actions speak
 volumes."
 
 Id.
 
 at 306 (capitalization in original).
 
 [1]
 
 In another email he warned, "[Y]ou cannot insist that we happily accept this and get along. I do not and will not."
 
 Id.
 
 at 309. Another email from Basil lamented, "To pretend that we are happy
 with your actions or that we are one big happy family would be a falsehood.... I will forever be disturbed by your actions."
 
 Id.
 
 at 317.
 

 The father was greatly upset by the reaction of his sons. One of his emails reminded them that he "always treated [them] with consideration, generosity and courtesy" and had "never lied" to them.
 
 Id.
 
 at 314. He pointed out that their stepmother had been his "lifetime partner, over several decades and has consistently and faithfully shown complete loyalty and support to [him] and [his] family."
 
 Id.
 
 Their views of her, the father declared, "are unfounded and totally unwarranted."
 
 Id.
 
 If they continued to ignore his wishes, he flatly said: "I will be very angry as you impugn my character. Remember also that no one has any entitlements of any kind and if I so desire I can bequeath whatever I wish to whomever I wish."
 
 Id.
 
 The father ended the email by telling his sons that they created "this nasty and regrettable situation."
 
 Id.
 
 Whether the family remained "intact," he said, "is now up to you two."
 
 Id.
 

 Shortly thereafter, on September 21, 2012, the father amended the trust (as restated on August 27, 2012) to include a no-contest provision, which states:
 

 Absent proof of fraud, dishonesty,
 
 or
 
 bad faith on the part of my Trustee, if any beneficiary or potential beneficiary under this trust agreement shall directly
 
 or
 
 indirectly, by legal proceedings
 
 or
 
 otherwise, challenge
 
 or
 
 contest this trust agreement
 
 or
 
 any of its provisions,
 
 or
 
 shall attempt in any way to interfere with the administration of this trust according to its express terms, any provision I have made in this trust agreement for the benefit of such beneficiary
 
 shall be revoked
 
 and the property that is the subject of such
 provision shall be disposed of as if that contesting beneficiary and all of his or her descendants had predeceased me. Absent proof of fraud, dishonesty,
 
 or
 
 bad faith on the part of my Trustee, the decision of my Trustee that a beneficiary or potential beneficiary is not qualified to take a share of the trust assets under this provision
 
 shall be final.
 

 Id.
 
 at 299 (emphases added).
 

 Another provision of the September 2012 amendment provided that, after the father died, his sons could not receive anything from the trust unless they executed a release of liability warranting that they would not sue the trustee, the personal representative of the father's estate, the father's attorneys in fact, or any other beneficiary under the trust. If either brother failed to execute the required release, that son's share "shall be revoked" by the trustee.
 
 Id.
 
 at 299-300. The September 2012 amendment to the trust also created a new class of contingent remainder beneficiaries, charitable organizations recognized under the Internal Revenue Code, to replace the sons as remainder beneficiaries in the event that the trustee determined that they violated the no-contest or release provisions.
 

 The father died on December 3, 2012. At the time of his death, he had been married to his wife for 23 years. On January 3, 2013, Paul wrote to the attorney who had drafted the August 2012 restatement and who had served as the trustee's initial legal counsel, declaring that "the testamentary documents purportedly executed in your office on or about August 27, 2012 by my late father"-which replaced the sons as co-trustees with their father's financial advisor as successor trustee and increased their stepmother's ability to use the corpus of the trust during times of need-"will be the subject of a contest."
 
 Id.
 
 at 293. He made this threat with the agreement of his brother, Basil.
 

 A day after announcing that the trust "will be the subject of a contest,"
 
 id.,
 
 Paul wrote a letter to his stepmother, at Basil's urging,
 
 see
 

 id.
 
 at 233-34, attempting to persuade her to terminate the trust outright and to agree to the immediate conveyance of two thirds of the trust assets to him and his brother. The letter asked for her agreement to the sons' desire "that the trust be set aside and dissolved."
 
 Id.
 
 at 294. If she failed to capitulate, leaving the sons
 "forced to contest" their father's trust and will, Paul warned his stepmother that she "would lose a substantial share of [her] income," that Basil and he
 "would take the $5.1 million distribution," and that, upon her death, Basil and he "would still take the remainder."
 
 Id.
 
 at 295. Paul added that he would "not belabor the legal issues of undue influence and lack of testamentary capacity," given that he and his brother would "save [their] arguments for the Court and jury if needed."
 
 Id.
 
 Paul gave his widowed stepmother ten days to respond in writing to his threats, "[s]o that no one has to incur needless legal expenses."
 
 Id.
 

 The attorney who drafted the September 2012 amendment retained the document in his office and did not provide it to the trustee until December 12, 2012. Upon her receipt of the document, the trustee promptly forwarded it to the sons. In response, legal counsel for Paul wrote the trustee's counsel stating that the sons were unaware of the no-contest provision and that, in any event, he did not believe that they had violated it. Paul merely wanted, counsel argued, "to introduce the concept of a non-judicial settlement agreement" for their stepmother's consideration.
 
 Id.
 
 at 304. Paul's counsel admitted that Paul's January 3, 2013 letter "can be fairly said to be a threat" but, counsel contended, it was "nothing more."
 
 Id.
 
 at 305. Paul's counsel verbally warned the trustee's counsel that the trustee would "be in for a dogfight" if she attempted to enforce the no-contest provision.
 
 Id.
 
 at 58.
 

 Faced with an apparent violation of the no-contest provision of the trust, the trustee asked legal counsel to advise her on the proper course of action. The trustee's counsel investigated the matter and issued a lengthy legal memorandum opining that the sons had violated the no-contest provision of the trust. After seeking legal counsel from the amendment's drafting attorney, reviewing her independent counsel's legal opinion, and considering the arguments made by the sons and their counsel, the trustee informed the sons that she had made her own independent determination that, in fact, both of them had violated the no-contest provision of the trust.
 

 The sons responded by filing suit to contest the trustee's determination. Their complaint characterized the September 2012 amendment as a "revo[cation] by a subsequent will and trust" rather than a mere amendment to the August 2012 restatement.
 
 Id.
 

 at 2.
 
 [2]
 
 They argued that the trustee misinterpreted the no-contest provision in an "arbitrary and capricious" manner "contrary to both the Grantor's intent as well as the laws and public policy of the Commonwealth of Virginia."
 
 Id.
 
 at 3. They also contended that the no-contest provision, properly interpreted, only applies when the contestant initiates actual legal proceedings and does not apply as a matter of law to anything short of that.
 

 The trustee responded by demurrer, pointing out that the complaint failed to mention, much less take into account, that the no-contest provision expressly delegated the final determination to the trustee: "Absent proof of fraud, dishonesty, or bad faith on the part of [the] Trustee," the clause emphasized, "the decision of [the] Trustee that a beneficiary or potential beneficiary is not qualified to take a share of the trust assets under this provision shall be final."
 
 Id.
 
 at 66-68;
 
 see also
 

 id.
 
 at 299. Because the sons did not allege fraud, dishonesty, or bad faith, the trustee contended, her determination should be deemed final.
 

 The trustee also addressed the sons' argument that nothing short of filing legal proceedings could violate the no-contest provision. By its own terms, she argued, the provision applied when any beneficiary shall "directly
 
 or
 
 indirectly, by legal proceedings
 
 or
 
 otherwise, challenge
 
 or
 
 contest this trust agreement
 
 or
 
 any of its provisions,
 
 or
 
 shall attempt in any way to interfere with the administration of this trust according to its express terms."
 
 Id.
 
 at 67 (emphases added);
 
 see also
 

 id.
 
 at 299.
 

 In their opposition to the demurrer, the sons conceded that they did not plead fraud, dishonesty, or bad faith by the trustee. They said a "specter of bad faith" may be present, but they were not attempting to plead or prove bad faith because, to obtain a court order nullifying the trustee's determination, it was "enough" for them "to simply establish that the Trustee 'got it wrong.' "
 
 Id.
 
 at 74. They "were not required to establish bad faith," the sons reasoned, because the issue was merely "whether the Trustee had properly
 interpreted the Trust's terms." Appellees' Br. at 2-3. With respect to the disjunctive clauses of the no-contest provisions, the sons argued that the court should find them overly broad and thus unenforceable.
 

 At the demurrer hearing, the sons' counsel contended that the trustee's argument "entirely misses the point." J.A. at 147. "We don't have to establish bad faith. We don't have to establish fraud [or] dishonesty," counsel contended.
 
 Id.
 
 at 149. If the court disagrees with the trustee's interpretation of the no-contest provision, they argued, it may do so without any pleading or proof that the trustee acted in bad faith. Without elaboration, the court denied the demurrer and set the matter on the docket for a later bench trial.
 

 At trial, both sons testified. Neither accused the trustee of fraud, dishonesty, or bad faith.
 
 See
 

 id.
 
 at 169-91 (testimony of Paul), 192-201 (testimony of Basil);
 
 see also
 

 id.
 
 at 232 (deposition transcript of Paul read into the record). They acknowledged the letters and emails sent to their father before his death and attempted to justify their displeasure with their father's trust and will. The trustee moved to strike the evidence "on the grounds that they have not put on any evidence whatsoever of bad faith or fraud, dishonesty at all."
 
 Id.
 
 at 202. The sons' counsel replied: "I thought we kind of got through this on the demurrer."
 
 Id.
 
 When the trial court asked the sons' counsel, "Well, ultimately, what do you want me to decide as far as the trustee is concerned in this case?"
 
 Id.
 
 Counsel responded, "Did she get it right?"
 
 Id.
 
 at 203.
 

 After the trial court denied the motion, the trustee presented her evidence. The trustee testified that she was a professional investment and wealth manager. She had no self-interest in any aspect of the trust distribution. She did not receive a copy of the September 2012 amendment to the trust until more than a week after the father had passed, but she nonetheless forwarded copies to the beneficiaries after she was able to "collect all the information, get all the documents, make copies," locate "all the names of the [beneficiaries]" entitled to receive copies, and "send them out."
 
 Id.
 
 at 207. The trustee sent out the notice required under the Virginia Uniform Trust Code, as well as copies of the September amendment to the trust, a full month before the notice date required by statute.
 
 See
 
 Code § 64.2-775(B)(3) (requiring a trustee to provide a statutory
 notice within 60 days of a revocable trust becoming irrevocable at the settlor's death and giving beneficiaries an opportunity to request copies of the trust agreement).
 

 The no-contest provision, she explained, expressly placed on her shoulders the duty to apply its terms and to make a final determination. She consulted with the attorney who had drafted the amendment, she hired independent legal counsel to advise her on the subject, and she requested input from the sons and considered all information they provided to her. The trustee said that her deliberations "took a couple of months," but in the end, "the decision itself seemed very straightforward."
 
 Id.
 
 at 211.
 

 The trustee said that she never discussed the situation with the stepmother or "ever ask[ed] her" for input.
 
 Id.
 
 at 210. The stepmother, as income beneficiary, stood to gain nothing from the trustee's determination. The consequences of the trustee's determination implicated only the primary remainder beneficiaries (the sons) and the contingent remainder beneficiaries (the charitable organizations that would later be named). When asked on cross-examination if she thought there was an overriding "fairness" issue for her to resolve, the trustee responded: "I am not in the position of deciding what's fair. I'm in the position of deciding what the trust tells me to do."
 
 Id.
 
 at 214.
 

 After the trustee's counsel completed her case-in-chief, the sons' counsel in his rebuttal case called Paul to the stand "on the issue of bad faith."
 
 Id.
 
 at 235. When Paul stated that the trustee's decision was "flawed by bad faith," the trial court interrupted, "he's not going to argue this case."
 
 Id.
 
 at 237. If counsel "want[ed] to ask him something factually that I've heard in evidence," the judge stated, "I'll be happy to allow you to do that."
 
 Id.
 
 When the sons' counsel could not come up with any factual questions to ask, the trustee's counsel objected to Paul's testimony. The court shut the rebuttal case down, characterizing it as simply "legal argument."
 
 Id.
 

 In closing argument, the court invited the sons' counsel to address a distinction not raised in the pleadings, testimony, or argument. "Let's assume," the court stated, that the sons were "attacking the trust."
 
 Id.
 
 at 241. "[W]hat is your position on what he was attacking, if anything?"
 
 Id.
 
 at 242. When counsel did not get the gist of this question, the court put the question more plainly:
 

 "Can he contest the trust agreement as amended in September ... when he didn't even know what it was?"
 
 Id.
 
 After the sons' counsel agreed and implied that he had made this very distinction earlier, the court stated: "So it would be your contention, if-and I understand your position is he was not, but if he was, that he was contesting the trust agreement made on August 27 ... [n]ot the trust agreement with the amendment."
 
 Id.
 
 at 242-43. "Exactly," the sons' counsel responded.
 
 Id.
 
 at 243.
 

 In its letter opinion following the trial, the court invalidated the trustee's determination under the no-contest provision. On three significant points, however, the court agreed with the trustee. First, the court held as a matter of law that the "fact that neither brother was aware of the [no-contest] provision is not dispositional."
 
 Id.
 
 at 125. Second, the court concluded that the letters written to the trustee's counsel and to the stepmother constituted a prohibited contest under the no-contest clause.
 
 Id.
 
 ("The Court concludes that the aforesaid letters were as enumerated in the 'no-contest' provision."). Third, the court held the sons acted in concert with each other. The contesting actions of one, therefore, would be imputed to the other.
 

 Despite these findings, the trial court ruled in favor of the sons. In doing so, the court relied exclusively on the theory that it had raised during closing argument with the sons' counsel. The court reasoned that the sons' contest of the trust did not target the trust as it existed at the time of their challenge. Their post-September 2012 actions were directed only at the un-amended August 2012 restatement of the trust. The no-contest provision, the court concluded, only applied to contests directed solely at the September 2012 amendment, which added the no-contest and release provisions. Applying this logic, the court held: "There was no prohibition against challenging any prior agreement or
 
 the
 
 trust agreement as written in 1989 or August 27, 2012."
 
 Id.
 
 at 125 (emphasis in original).
 

 The trustee's counsel filed a motion for reconsideration, arguing that the court had misquoted the no-contest provision.
 
 [3]
 
 Later during
 the hearing, when discussing an award of attorney fees, the trustee's counsel also stated: "I don't think [the sons' counsel] actually made the argument that was the basis for your decision. I'd never heard that until the Court raised it itself at the end of the case."
 
 Id.
 
 at 260. The court disagreed, denied the motion, reaffirmed its reasoning in the letter opinion, and entered a final order finding, for the first time, that the trustee was guilty of "bad faith" when she made her no-contest determination.
 
 Id.
 
 at 131.
 II.
 

 On appeal, the trustee raises several assignments of error seeking a reversal. The sons raise cross-assignments of error seeking an affirmance for reasons that the trial court either rejected or failed to address. All of the assertions of error, however, cluster around a single question: Did the sons plead and prove sufficient grounds for the trial court to overturn the trustee's no-contest determination?
 

 A. The Threshold Question of Deference to the Trustee's Determination
 

 The ultimate question in this case-whether the trial court correctly set aside the trustee's determination-requires us first to decide what, if any, judicial deference the trial court owed the trustee. The parties sharply differ on the answer to this threshold issue.
 

 Quoting from the text of the no-contest provision, the trustee points out that the trust obligated her to determine if any beneficiary had violated the provision. She could not look the other way in the face of an apparent violation because the provision stated that the violator's share of the trust "shall be revoked,"
 
 id.
 
 at 299, if a violation occurred. The provision then ends with a clear, but not absolute, allocation of delegable authority: "Absent proof of fraud, dishonesty, or bad faith on the part of my Trustee, the decision of my Trustee ... shall be final."
 
 Id.
 

 The sons concede that the text of the provision says what it says, but they contend that it violates §§ 64.2-703(B) and 64.2-777 of the Virginia Uniform Trust Code. They argue that these provisions, coupled with general equitable principles governing trusts, render unenforceable on public policy grounds the "shall be final" wording of the no-contest provision. From there, the sons reason that the trial court should have reviewed the trustee's decision de novo (without the need for a last-minute bad faith finding) and should have concluded (for various other reasons) that the sons did not violate the no-contest provision.
 

 Consideration of this threshold issue should begin with a review of the history of no-contest provisions and the settled principles governing them. There appears to be something basic and natural about a giver wanting his gifts, particularly those given after his death, to be received without rancor and disputation. Examples of testamentary no-contest provisions date back to the ancient times.
 
 [4]
 
 English common law and chancery courts enforced no-contest provisions, subject to various limiting principles, throughout the 17th and 18th centuries.
 
 [5]
 
 Early American courts did as well.
 
 See, e.g.,
 

 Smithsonian Inst. v. Meech,
 

 169 U.S. 398
 
 , 415,
 
 18 S.Ct. 396
 
 ,
 
 42 L.Ed. 793
 
 (1898) (noting that "courts wisely hold" that a testator may "condition" a bequest on a requirement that a legatee "acquiesce" with the terms of the will).
 

 We have made clear that no-contest provisions are prima facie valid in Virginia.
 
 See
 

 Womble v. Gunter,
 

 198 Va. 522
 
 , 525,
 
 95 S.E.2d 213
 
 , 216 (1956) (approving such a provision in a will);
 
 Keener v. Keener,
 

 278 Va. 435
 
 , 442,
 
 682 S.E.2d 545
 
 , 548 (2009) (extending approval of no-contest clauses to trusts). Equally clear is that we have adopted no hard-and-fast rules governing their scope. It is the settlor's intent that controls: "What activity or participation constitutes a contest or attempt to defeat a will depends upon the wording of the 'no contest' provision and the facts and circumstances of each particular case."
 
 Keener,
 

 278 Va. at 441
 
 ,
 
 682 S.E.2d at 548
 
 (quoting
 
 Womble,
 

 198 Va. at 529
 
 ,
 
 95 S.E.2d at
 
 219 );
 
 see also
 
 1 T.W. Harrison & James P. Cox, Harrison on Wills and Administration for Virginia and West Virginia § 21.05[4], at 21-13 (4th ed.2007).
 

 In
 
 Keener,
 
 a trust provision stated that any beneficiary who "objects to or contests"
 

 the trust "shall forfeit" his distributable share except for $1.00.
 
 278 Va. at 439
 
 ,
 
 682 S.E.2d at 546
 
 . Quoting from
 
 Womble,
 
 we reaffirmed that the "wording of the 'no contest' provision" determines its scope and identifies the circumstances that constitute "a contest or attempt to defeat" the trust.
 
 Id.
 
 at 441,
 
 682 S.E.2d at 548
 
 . We also emphasized that a no-contest provision should be "strictly enforced according to its terms," even if doing so had the effect (at least in a pour-over trust) of "disinheriting all the members of the testator's family," including "infants" otherwise entitled to a distribution.
 
 Id.
 
 at 442,
 
 682 S.E.2d at 548
 
 .
 

 "[C]ompelling reasons" justify the "strict enforcement" of such provisions, we held, because they protect the right of a testator or settlor "to dispose of his property as he sees fit" and safeguard "the societal benefit of deterring the bitter family disputes that will [and trust] contests frequently engender."
 

 Id.
 

 (citing
 
 Womble,
 

 198 Va. at 526-27, 532
 
 ,
 
 95 S.E.2d at 217
 
 , 220-21 ). Somewhat paradoxically, however,
 
 Keener
 
 also said that no-contest provisions should be "strictly construed" because the testator or settlor "has the opportunity to select the language that will most precisely express [his] intent."
 
 Id.
 
 at 442-43,
 
 682 S.E.2d at 548
 
 .
 

 The synthesis of strict enforcement and strict construction makes sense only by separating the related, but conceptually distinct, issues of legal validity and textual construction. Virginia courts do not begrudgingly enforce no-contest provisions. To the contrary, the "clear terms" of such provisions must be "strictly enforced,"
 
 id.
 
 at 442-43,
 
 682 S.E.2d at 548-49
 
 , without regard to the severity of the result. On the other hand, the inflexibility of strict enforcement cannot be predicated on supposed inferences of settlor intent that are not reflected in the actual text of a no-contest provision. In this sense, we strictly construe the text to the extent necessary to ensure that the plain meaning of the provision clearly calls for forfeiture, which, admittedly, is a result typically disfavored in law.
 
 [6]
 

 Keener
 
 is a good example of both ideas working together. We reaffirmed that the "wording of the 'no contest' provision and the facts and circumstances" of each case determined what "constitutes a contest" and an "attempt to defeat" the trust.
 
 Id.
 
 at 441,
 
 682 S.E.2d at 548
 
 (citation omitted). We also did not hesitate to say that such a provision should be strictly enforced. Even so, we held that the provision in that case, by its plain terms, applied only to contests of "any provision of this
 
 Trust
 
 " and did not purport to apply to contests of a related will.
 
 Id.
 
 at 443,
 
 682 S.E.2d at 549
 
 (emphasis added);
 
 accord
 

 Virginia Found. of Indep. Colls. v. Goodrich,
 

 246 Va. 435
 
 , 439,
 
 436 S.E.2d 418
 
 , 420 (1993) (holding that seeking guidance from the court in interpreting a will was not a challenge "questioning" the testator's intent under the no-contest clause in that case). The principle of strict construction precluded us from judicially extending the no-contest provision beyond its plain terms.
 

 In this case, the trustee argues that the no-contest provision passes easily through the filter of strict construction. Without proof that the trustee is guilty of "fraud, dishonesty, or bad faith," her determination of whether a beneficiary has violated the no-contest provision "shall be final." J.A. at 299. I agree that the plain meaning of this provision has no textual ambiguity requiring judicial strict construction.
 
 See generally
 

 Citizens' Bank v. Parker,
 

 192 U.S. 73
 
 , 85-86,
 
 24 S.Ct. 181
 
 ,
 
 48 L.Ed. 346
 
 (1904) (noting that the "proper office" of the rule of strict construction "is to help to solve ambiguities" but that "it is the judicial duty" to first "ascertain if doubt exists").
 
 [7]
 
 Text that has a plain
 meaning needs no judicial construction.
 
 See
 

 Conner v. Hendrix,
 

 194 Va. 17
 
 , 25,
 
 72 S.E.2d 259
 
 , 265 (1952) (" 'The province of construction lies wholly within the domain of ambiguity.' If it is too plain to misunderstand, there is nothing to construe.") (quoting
 
 Norfolk Motor Exch., Inc. v. Grubb,
 

 152 Va. 471
 
 , 478,
 
 147 S.E. 214
 
 , 216 (1929) );
 
 see also
 

 Virginia Broad. Corp. v. Commonwealth,
 

 286 Va. 239
 
 , 249,
 
 749 S.E.2d 313
 
 , 318 (2013) ;
 
 Smith v. Smith,
 

 3 Va.App. 510
 
 , 513-14,
 
 351 S.E.2d 593
 
 , 595-96 (1986). "An absolute unqualified sentence or proposition," Sir Edward Coke reminds us, "needs no expositor." 2 Sir Edward Coke, Institutes of the Laws of England 533 (15th ed. 1797) (translation of original text).
 

 Perhaps so, the sons respond, but this particular language should not be enforced because it violates the Virginia Uniform Trust Code and general equitable principles governing trusts. This argument, however, runs afoul of the principle of "strict enforcement" and the "compelling reasons" recognized by law for such provisions, including the settlor's right "to dispose of his property as he sees fit" and the accompanying "societal benefit of deterring the bitter family disputes that will [and trust] contests frequently engender."
 
 Keener,
 

 278 Va. at 442
 
 ,
 
 682 S.E.2d at
 
 548 (citing
 
 Womble,
 

 198 Va. at 526-27, 532
 
 ,
 
 95 S.E.2d at 217
 
 , 220-21 ).
 

 Contrary to the sons' view, nothing in the Virginia Uniform Trust Code precludes strict enforcement of their father's no-contest provision to the facts of this case. Code § 64.2-703(B)(2) requires trustees to "act in good faith and in accordance with the terms and purposes of the trust and the interest of the beneficiaries."
 
 See also
 
 Code § 64.2-777(B) (subjecting the trustee's "exercise of a power ... to the fiduciary duties prescribed by this article"). The no-contest provision does not offend this statutory duty. The provision itself requires the trustee's determination to be disregarded if it is a product of "bad faith." J.A. at 299. It also removes finality from any trustee's determination infected by "fraud" or "dishonesty."
 

 Id.
 

 It is true that Code § 64.2-765 also codifies the equitable duty of impartiality in the context of "two or more beneficiaries" and requires a trustee to treat "impartially" their "respective interests." The "substantive" aspects of impartiality generally prohibit unfair "favoritism" between beneficiaries and require diligent "good-faith" efforts to honor the respective interests of competing beneficiaries. Restatement (Third) of Trusts § 79 cmt. c (2007);
 
 see, e.g.,
 
 14 George Gleason Bogert et al., The Law of Trusts and Trustees § 612, at 49 (3d ed.2000) (noting that the impartiality duty is often implicated when a trustee's "investment transactions" favor one set of beneficiaries over another).
 

 In this case, I see no need to address whether the equitable duty of impartiality is merely a conceptual species within the genus of fiduciary good faith or, instead, whether the two involve wholly dissimilar concepts. The sons do not assert any violation of Code § 64.2-765, nor did the trial court find any evidence of impermissible partiality. This is understandable given that the stepmother did not gain any financial benefit from the trustee's determination on the no-contest provision. The only real monetary contest was between the sons, as named remainder beneficiaries, and the charitable organizations, as contingent remainder beneficiaries.
 

 I also disagree that the trustee's determination in this case was in defiance to "the terms and purposes of the trust and the interests of the beneficiaries." Code § 64.2-703(B)(2). The no-contest provision
 
 is
 
 one of the "terms" of the trust that effectuates the "purposes" of the trust.
 

 Id.
 

 If either brother violated the provision, it declares that his share "shall be revoked." J.A. at 299. The trustee complied with the terms and purposes of the trust when she shouldered the responsibility of determining whether the sons had violated their father's emphatically worded prohibition on conduct that "directly
 
 or
 
 indirectly, by legal proceedings
 
 or
 
 otherwise" constituted a "challenge
 
 or
 
 contest" of "this trust agreement
 
 or
 
 any of its provisions" or constituted an "attempt in any way to interfere with the administration of this trust according to its express terms."
 

 Id.
 

 (emphases added). The trustee's exercise of
 her duties under the no-contest provision did not violate "the terms and purposes of the trust." Code § 64.2-703(B)(2).
 

 The sons emphasize that the trustee's duty to protect the "interests of the beneficiaries" still remains.
 

 Id.
 

 While this is true, a trustee cannot protect the beneficiaries' interests more sedulously than the settlor intended. A no-contest provision represents strong medicine for the fractious intra-family contests that sometimes follow the death of a settlor. But it is the settlor's assets being distributed to his beneficiaries. Thus, it is the settlor, not the beneficiaries, who determines the legally recognizable "interests of the beneficiaries."
 

 Id.
 

 The trustee cannot expand or contract those interests in violation of the settlor's expressed intent.
 
 [8]
 

 In short, the no-contest provision in this case needs no judicial construction, strict or otherwise, with respect to the trustee's role in determining whether a violation has occurred. The trustee's determination "shall be final" absent "proof of fraud, dishonesty, or bad faith." J.A. at 299. This delegation of discretion to the trustee benefits from the "strict enforcement" these provisions should be given by the courts in light of the "compelling reasons,"
 
 Keener,
 

 278 Va. at 442
 
 ,
 
 682 S.E.2d at
 
 548 (citing
 
 Womble,
 

 198 Va. at 526-27, 532
 
 ,
 
 95 S.E.2d at 217
 
 , 220-21 ), for their presumed validity. The sons offer nothing from the Virginia Uniform Trust Code or general trust principles to rebut the judicial presumption of strict enforcement.
 

 b. The Sons' Proposed "Arbitrary and Capricious" Standard
 

 Virginia has more than a century of jurisprudence addressing specific settlor grants of broad discretionary authority to trustees. A long line of authorities limits judicial review to allegations of trustee fraud, bad faith, or other misconduct of similar magnitude.
 
 See, e.g.,
 

 Givens v. Clem,
 

 107 Va. 435
 
 , 437-38,
 
 59 S.E. 413
 
 , 414 (1907) (stating that "a court of equity has no jurisdiction to interfere" with a discretionary trust "so long as the trustee acts in good faith");
 
 Trout v. Pratt,
 

 106 Va. 431
 
 , 442,
 
 56 S.E. 165
 
 , 169 (1907) ("If the trustees exercise their discretionary powers in good faith and without fraud and collusion the court cannot control or review their discretion." (citation omitted));
 
 Dillard v. Dillard,
 

 97 Va. 434
 
 , 442,
 
 34 S.E. 60
 
 , 63 (1899) (same);
 
 [9]
 
 1 Harrison & Cox,
 
 supra,
 
 § 21.13, at 21-42 ("It is well settled in Virginia ... that where the trust is discretionary or one of personal confidence a
 court of equity has no jurisdiction to interfere with its exercise by the trustee so long as he acts in good faith.");
 
 see also
 

 McCamant v. Nuckolls,
 

 85 Va. 331
 
 , 337-38,
 
 12 S.E. 160
 
 , 162 (1888) ("As regards such powers as are discretionary and depend on the opinion and judgment of the donee of the power, the courts, unless in cases of fraud, have no jurisdiction to interfere." (alterations omitted));
 
 Cochran v. Paris,
 

 52 Va. (11 Gratt.) 348
 
 , 356-57 (1854) (noting that, under Virginia law, trustee determinations committed to their "pure personal judgment" are matters that "cannot in general be assumed or even controlled by the court").
 
 [10]
 
 The no-contest provision in this case incorporated similar limitations on the trustee's authority by withdrawing the settlor's authority to make a "final" determination if it is infected by "fraud, dishonesty, or bad faith." J.A. at 299. The sons argue that this restriction does not go far enough. They propose that we adopt an "arbitrary and capricious" standard of judicial review to cover situations when a trustee makes an outrageously wrong determination under a no-contest provision of this kind-but does so innocently, with honest motives, and in good faith. Appellees' Br. at 14-18. I find the argument purely academic in this case. Even if such a standard judicially supplemented the language of the no-contest provision in this case,
 
 [11]
 
 nothing in this record comes
 close to showing that the trustee's determination was arbitrary and capricious.
 
 [12]
 

 The sons' first attempt to implicate their proposed standard is to say that the trustee's interpretation of the no-contest provision was grossly in error because the provision only applies to litigation contests. I see no merit in this argument. The father intended the forfeiture to be mandatory ("shall be revoked") if either son directly or indirectly asserted a challenge or contest via litigation ("by legal proceedings") or by any other means ("or otherwise"). J.A. at 299. He also intended the forfeiture to be similarly mandatory if his sons "attempt[ed] in any way to interfere with the administration" of the trust.
 

 Id.
 

 No legitimate exercise in textual interpretation would justify the conclusion that this provision applies only to contests and challenges asserted in court.
 
 [13]
 
 As I noted earlier, the "wording of the 'no contest' provision" determines its scope and identifies the circumstances that constitute "a contest or attempt to defeat" the trust.
 
 Keener,
 

 278 Va. at 441
 
 ,
 
 682 S.E.2d at 548
 
 (quoting
 
 Womble,
 

 198 Va. at 529
 
 ,
 
 95 S.E.2d at
 
 219 ). We have never held that Virginia law invalidates no-contest provisions worded in such a way as to apply to contests short of litigation, and I see no reason to do so now.
 

 Next, the sons say that the trustee's determination offended their proposed arbitrary-and-capricious standard because the trustee failed to take into account that they backed down after they realized their actions put their inheritance in jeopardy. This assertion may have some emotive value, but that does not translate into legal relevance. The law does not give parties an inviolate right to cure a fully consummated breach. Nor has any precedent ever suggested that the legal
 efficacy of a conditional gift necessarily depends on the donee's knowledge of the condition. And for good
 reason: If there were such a rule, a donor's condition could be avoided unilaterally simply by a donee willfully ignoring it, falsely claiming ignorance, or conceding knowledge of the condition but protesting his misunderstanding of it. I thus cannot conclude that the trustee acted arbitrarily or capriciously by not giving dispositive weight to the sons' expression of regret for their actions upon discovering their father's no-contest provision.
 
 [14]
 

 Even in cases in which the no-contest provision applies only to litigation contests, the "general rule is that 'a resort to the means provided by law for attacking the validity of a will amounts to a contest, although the contestant subsequently withdraws before the final hearing and even though the contestant subsequently treats the will as valid and seeks construction.' "
 
 Womble,
 

 198 Va. at 529
 
 ,
 
 95 S.E.2d at 219
 
 (citation omitted);
 
 see also
 
 1 Harrison & Cox,
 
 supra,
 
 § 21.05[4], at 21-13; Restatement (Third) of Property: Wills and Donative Transfers § 8.5 cmt. d (2003). The same principle equally applies here, where the sons later recanted their fully consummated violation of the no-contest provision that, by its express terms, applied to contests asserted in litigation "or otherwise." J.A. at 299.
 

 Finally, although the sons only briefly mention the point on appeal, I address the theory raised by the trial court during closing argument and adopted in its letter opinion. The court apparently reasoned that the sons had in fact violated the no-contest provision, but that the provision, as the court interpreted it, only applied to contests directed at the September 2012 amendment. In other words, the court held, "There was no prohibition against challenging any prior agreement or
 
 the
 
 trust agreement as written in 1989 or August 27, 2012."
 
 Id.
 
 at 125 (emphasis in original). I find this argument unpersuasive.
 

 The no-contest provision applies to challenges or contests of "this trust agreement or any of its provisions"-which would necessarily include provisions in earlier versions that the amendment explicitly "ratified and confirmed."
 
 Id.
 
 at 299-300. The provision also applied to attempts to interfere with the administration of "this trust."
 
 Id.
 
 at 299. There was, and still is, only one trust.
 

 The trust agreement includes the August 2012 restatement and the September 2012 amendment. The September 2012 amendment was as much a part of the "trust agreement" as the August 2012 restatement.
 
 Id.
 
 at 299-300.
 

 C. The Trial Court's Belated "Bad Faith" Finding
 

 The no-contest provision withdraws the finality of the trustee's determination if the trustee was guilty of bad faith, fraud, or dishonesty. In this case, the trial court's letter opinion said nothing about bad faith and instead adopted the theory limiting the scope of the no-contest provision only to attacks on the September 2012 amendment. After the trustee's counsel filed and argued a motion to reconsider, the court announced for the first time that the trustee was guilty of "bad faith."
 
 Id.
 
 at 131.
 

 On appeal, the trustee argues that the trial court sua sponte injected the bad-faith issue into the case and that the sons did not plead bad faith in their complaint. This was the very point, the trustee insists, that she made at her unsuccessful demurrer hearing. The sons' response, at the time of the demurrer, was that their allegations raised "the specter of bad faith" but that they were not attempting to plead or prove bad faith (or dishonesty or fraud) because, to obtain a court order nullifying the trustee's determination, it was "enough" for them "to simply establish that the Trustee 'got it wrong.' "
 
 Id.
 
 at 74. Consequently, the sons argued that "they did not have to allege bad faith." Appellee's Br. at 14. To be sure, even on appeal, the sons
 continue to maintain that the "trial court erred in ruling that the Trust was governed by the bad faith standard of the No Contest Clause."
 
 Id.
 
 at 13;
 
 see also
 

 id.
 
 at 19 (arguing that "[the] bad faith standard should not apply").
 

 Few axioms of Virginia law are better settled than our view that a litigant's "[p]leadings are as essential as proof, and no relief should be granted that does not substantially accord with the case as made in the pleading."
 
 Ted Lansing Supply Co. v. Royal Aluminum & Constr. Corp.,
 

 221 Va. 1139
 
 , 1141,
 
 277 S.E.2d 228
 
 , 229-30 (1981) (quoting
 
 Bank of Giles Cty. v. Mason,
 

 199 Va. 176
 
 , 180,
 
 98 S.E.2d 905
 
 , 907 (1957) ). Therefore, "[n]o court can base its decree upon facts not alleged, nor render its judgment upon a right, however meritorious, which has not been pleaded and claimed."
 
 Id.
 
 at 1141,
 
 277 S.E.2d at 230
 
 (quoting
 
 Potts v. Mathieson Alkali Works,
 

 165 Va. 196
 
 , 207,
 
 181 S.E. 521
 
 , 525 (1935) ). The trial court erred in holding that the trustee acted in bad faith because nothing in the sons' complaint (as the demurrer hearing confirmed) made that allegation.
 
 See
 
 Oral Argument Audio at 16:55 to 17:15 (concession by sons' counsel that "we did not expressly allege bad faith [in any pleading]").
 

 On this point, I acknowledge the concerns expressed by the sons' counsel on appeal. He suggests that, in the context of a trustee's duties, the concept of bad faith may have a different meaning than the one generally recognized in law. In many contexts, bad faith implies "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity.... [I]t contemplates a state of mind affirmatively operating with furtive design or ill will." Black's Law Dictionary 139 (6th ed.1990);
 
 see, e.g.,
 

 Logan v. Commonwealth,
 

 279 Va. 288
 
 , 293 n. 3,
 
 688 S.E.2d 275
 
 , 278 n. 3 (2010) (noting that, "in the civil context," bad faith "connotes the 'conscious doing of a wrong' " (citation omitted)).
 

 I need not hypothesize whether an allegation of bad faith connotes something different in a trust case than it does in any other civil case. Nor do I see the need to address whether any evidence in this record would be sufficient to prove an allegation of bad faith-because there never was any allegation of bad faith in this case.
 
 See
 

 Hoffman v. First Va. Bank,
 

 220 Va. 834
 
 , 836, 842,
 
 263 S.E.2d 402
 
 , 404, 408 (1980) (affirming the trial court's sustaining of a demurrer and noting that the "amended bill of complaint contained no allegation of fraud, bad faith, or conflict of interest on the part of the Trustee").
 
 [15]
 
 From the beginning of this litigation until now, the sons have consistently maintained that they did not need to plead bad faith. Based on that view, they never did.
 
 [16]
 

 III.
 

 In sum, the no-contest provision delegated to the trustee the final decision on whether the sons' conduct following their father's death violated the broad terms of the no-contest provision. Given the evidentiary record
 and the pleadings before it, the trial court erred in overturning the trustee's decision. In my opinion, the case should be reversed with the entry of final judgment dismissing the complaint with prejudice.
 
 [17]
 

 For these reasons, I respectfully dissent.
 

 The majority opinion recites the text of this assignment of error in full. In my view, that text "point[s] out the errors with reasonable certainty in order to direct this court and opposing counsel to the points on which the appellant intends to ask a reversal of the judgment."
 
 Findlay v. Commonwealth,
 

 287 Va. 111
 
 , 115,
 
 752 S.E.2d 868
 
 , 871 (2014) (internal quotation marks and alteration omitted). It is sufficient to challenge both the circuit court's evidentiary finding that the sons' conduct did not violate the no-contest clause and its legal ruling that the no-contest clause applied only to challenges to the September 2012 amendment, rather than the August 2012 amendment and restatement. The trustee makes both arguments on brief, as she did in her petition for appeal.
 

 Paul wrote the email on behalf of himself and his brother and forwarded it to Basil. "You have accurately and eloquently summarized the situation without emotion," Basil told his brother in response. J.A. at 310. "Your words are clear and true. Well-said Brother."
 

 Id.
 

 The trial court, following a bench trial, made a factual finding that "Basil Georgiadis is bound by the letters because he agreed with the contents and authorized them to be sent by his brother."
 
 Id.
 
 at 125. On appeal, the sons have waived any challenge to this finding. Appellee's Br. at 4 n. 3.
 

 According to the language of the September 21, 2012 trust amendment, however, it did nothing other than "amend" the August 27, 2012 restatement of the trust agreement. J.A. at 298. The September amendment otherwise affirmed all unaffected portions of the August restatement, explicitly stating, "In all respects not hereinabove altered, the [August 27, 2012] Trust Agreement is hereby
 
 ratified and confirmed.
 
 "
 
 Id.
 
 at 300 (emphasis added). Settlors of revocable trusts may revoke (and restate entirely) or amend the trust agreement "[b]y substantial compliance with a method provided in the terms of the trust." Code § 64.2-751(C)(1).
 

 The trial court's letter opinion mistakenly stated that the settlor had limited disqualifying conduct to "
 
 this
 
 trust agreement." J.A. at 125 (emphasis in original). But the clause more broadly forbade interference with "the administration of this trust."
 
 Id.
 
 at 299. At the hearing on the motion for reconsideration, the trustee identified the court's faulty recollection of the trust language, noting that the court had erroneously read the clause to prohibit challenges to or interference with the September trust
 
 agreement,
 
 rather than the trust itself. Because the clause actually reads "interference with the trust," the trustee argued, "the logic of the decision ... comes apart."
 
 Id.
 
 The trustee also noted that the September 2012 amendment specifically "ratified and confirmed" the "Trust Agreement."
 
 Id.
 
 at 300.
 

 See generally
 
 Gerry W. Beyer et al.,
 
 The Fine Art of Intimidating Disgruntled Beneficiaries With In Terrorem Clauses,
 

 51 SMU L. Rev. 225
 
 , 230-31 (1998).
 

 Id.
 

 at 231-40 ;
 
 see also
 
 Olin L. Browder, Jr.,
 
 Testamentary Conditions Against Contest,
 

 36 Mich. L. Rev. 1066
 
 , 1093-96 (1938); Jack Leavitt,
 
 Scope and Effectiveness of No-Contest Clauses in Last Wills and Testaments,
 

 15 Hastings L.J. 45
 
 , 47-49 (1963).
 

 On this point, I concur with Professor Leavitt's reconciliation of these two seemingly discordant principles: "It is true that a forfeiture clause is to be strictly construed, but it is equally true that if the provisions are not strictured by law or by public policy they will be enforced according to the ascertained intent of the testator." Leavitt,
 
 supra
 
 note 5, at 64.
 

 See also
 

 Lincoln Nat'l Life Ins. v. Commonwealth Corrugated Container Corp.,
 

 229 Va. 132
 
 , 136-37,
 
 327 S.E.2d 98
 
 , 101 (1985) (applying the principle of strict construction to an insurance policy "[b]ecause the policy language is ambiguous");
 
 Williams v. Mutual of Omaha,
 

 297 F.2d 876
 
 , 879 (4th Cir.1962) (analyzing an insurance contract and stating that "no ambiguity arises for application of the principle of strict construction").
 

 On this last point, it bears mentioning that the sons only address their personal interest as remainder beneficiaries. They fail to acknowledge that their father also designated charitable organizations as contingent remainder beneficiaries that would take the sons' shares of the trust if the sons were found to have violated the no-contest provision. The sons fail to explain why these contingent remainder beneficiaries should not also be considered within the command of Code § 64.2-703(B)(2) that the trustee take into account the "interests of the beneficiaries."
 

 In
 
 Dillard,
 
 the testatrix of a will vested her testamentary co-trustees with "an absolute and uncontrollable discretion" regarding the gift of certain real estate to her son.
 
 Id.
 
 at 440,
 
 34 S.E. at 62
 
 . In her will, she expressly stated that the trustees "shall not be compelled, or be liable to be compelled to do so, either at law or in equity" to act other than their judgment required, thus implying the finality of their decision.
 

 Id.
 

 We affirmed the "uncontrollable power of the trustees,"
 
 id.
 
 at 441,
 
 34 S.E. at 63
 
 , and noted that "[w]here the trust is discretionary, or one of personal confidence, a court of equity has no jurisdiction to interfere with its exercise by the trustee so long as he acts in good faith,"
 
 id.
 
 at 442,
 
 34 S.E. at
 
 63 ;
 
 see also
 
 James Hill,
 
 A Practical Treatise on the Law Relating to Trustees
 
 715 (2d Am. ed. 1854) ("As a court of equity will not in general assume the exercise of a discretionary power vested in trustees, so it will not interfere to control the trustees acting
 
 bona fide
 
 in the exercise of their discretion.").
 

 This approach is consistent with the majority of other jurisdictions, which similarly limit the scope of judicial review in cases in which a trustee possesses "more extensive discretion" to determinations of "whether the trustee acted or failed to act in good faith and with proper motive." 4 George Gleason Bogert et al., The Law of Trusts and Trustees § 228, at 564 (3d ed.2007) ;
 
 see also
 
 id.
 

 § 228, at 563 nn. 3-4 (collecting cases reviewing actions of trustees with absolute discretion for bad faith, fraud, improper motive, malice, dishonesty, or failure to act in the interest of the beneficiaries). However, "[a]t the other end of the continuum, where the trustee's discretion is least extensive, courts may give the trustee less latitude and review for reasonableness."
 

 Id.
 

 § 228, at 565.
 

 I acknowledge our cases stating that a trustee may not abuse her discretion by exercising it "in such an arbitrary manner, as, in effect, to make it a means of destroying the trust."
 
 Rinker v. Simpson,
 

 159 Va. 612
 
 , 621-22,
 
 166 S.E. 546
 
 , 549 (1932) ;
 
 see also
 

 NationsBank of Va., N.A. v. Estate of Grandy,
 

 248 Va. 557
 
 , 561-62,
 
 450 S.E.2d 140
 
 , 143 (1994) ;
 
 Trout,
 

 106 Va. at 443
 
 ,
 
 56 S.E. at 169
 
 . In both
 
 Rinker
 
 and
 
 Trout,
 
 however, the trust instrument vested absolute discretion in the trustee, making no express exception for the presence of fraud, dishonesty, or bad faith, as the father did here.
 
 See
 
 J.A. at 299. In
 
 Grandy,
 
 we restated the equitable principle raised by
 
 Rinker,
 
 but we held that the trial court had "impermissibly substituted its judgment for that of the trustees."
 
 Grandy,
 

 248 Va. at 562
 
 ,
 
 450 S.E.2d at 144
 
 . In these cases, we merely recognized, as the Virginia Uniform Trust Code does now, that broad trustee discretion cannot be employed to destroy the trust, which would be the ultimate defiance of the settlor's intent.
 
 See
 
 Code § 64.2-703(B)(2). Enforcing the no-contest clause in this case, which expressly ifies the trustee's discretion in cases of "fraud, dishonestly, or bad faith," J.A. at 299, cannot reasonably be said to have this effect.
 

 For reasons previously mentioned,
 
 supra
 
 at 891-92, I do not address whether the no-contest provision would preclude a court from examining whether a trustee's determination violated Code § 64.2-765's duty of impartiality.
 

 The trial court appears to have agreed. The court's letter opinion, incorporated by reference into the final order, stated: "The Court concludes that the aforesaid letters [directed by the sons to the trustee's counsel and to the stepmother] were as enumerated in the 'no-contest' provision." J.A. at 125.
 

 The trial court appears to have agreed with this point as well. The court's letter opinion concluded that the "fact that neither brother was aware of the [no-contest] provision" was "not dispositional."
 
 Id.
 

 See also
 

 Trout,
 

 106 Va. at 441
 
 ,
 
 56 S.E. at 168
 
 (noting that "he who invokes the aid of the court to regulate and control the [broad] discretion with which the [trustee] was clothed must set forth facts and circumstances which will call into activity the power of the court to regulate the broad discretion conferred upon the trustee-must show that the trustee has acted in bad faith");
 
 Virginia-Carolina Chem. Co. v. Carpenter & Co.,
 

 99 Va. 292
 
 , 293,
 
 38 S.E. 143
 
 , 144 (1901) (stating that "a charge of fraud or bad faith must be clearly and distinctly proven").
 

 The majority addresses the merits of the unpled bad faith claim, holds that the trustee acted in bad faith, and then concludes that it would not matter "[e]ven if there [were] no evidence ... of bad faith" because the trial court's finding of bad faith was merely "an alternative or additional ground" for its ultimate, sua sponte holding-
 
 i.e.,
 
 that the no-contest provision only prohibited contests of the September 2012 amendment adding the no-contest provision-which the majority affirms.
 
 Ante
 
 at 877-78. The majority then faults the trustee for not wording her assignments of error clearly enough to reach the underlying issue.
 
 Ante
 
 at 878. For several grounds that need no additional elaboration, I cannot concur with this uniquely sequenced line of reasoning.
 

 My view would necessarily require the vacature of the trial court's award of prevailing party attorney fees to the sons under Code § 64.2-795.
 
 See
 
 Appellant's Br. at 11 (fourth assignment of error).